## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

DAVID JOSEF ROSHWALD, JP POLITANO,
and JACQUESON ELIE, individually and on
behalf of all others similarly situated,

                    Plaintiffs,

     v.

JPMORGAN CHASE BANK, N.A., and
BANK OF AMERICA, N.A.

                    Defendants.

Case No. _____

Class Action Complaint

**<u>Jury Trial Demanded</u>**

### INTRODUCTION

1.　　For the past several years, Christopher Alexander Delgado and his company Goliath Ventures Inc. offered investors the opportunity to receive safe and stable returns from cryptocurrency liquidity pools. The pitch was that investors' funds would be contributed to collections of cryptocurrency that provide asset liquidity to traders on certain exchanges. Investors would not need to do much other than send money to Goliath. Goliath told investors that they would receive guaranteed monthly returns of between 3-8% as well as a guarantee that their principal investment would be preserved.

2.　　Goliath's marketing campaign and referral network were successful. Over a three-year period, the company collected over $300 million from investors across various states and in Canada. Until recently, investors were receiving the monthly returns that Goliath promised them, and some investors were able to withdraw their principal from the company.

3.　　When Delgado was arrested by federal authorities and charged with wire fraud and money laundering in February 2026, however, it quickly became apparent that he had actually been running a Ponzi scheme. Instead of placing investors' money in liquidity pools, Delgado and

Goliath used investor money to fund lavish personal and corporate expenses, and to pay purported returns to existing investors.

4. JPMorgan and Bank of America had unique insight into Goliath's operations and the true nature of what it was doing with investors' money. After investors' funds were deposited into Goliath's traditional bank accounts at JPMorgan and at Bank of America, Delgado used his accounts at these banks to pay supposed returns to existing investors and to support his lifestyle. But rather than expose Delgado's fraudulent business, JPMorgan and Bank of America chose to profit from it.

5. Plaintiffs David Josef Roshwald, JP Politano, and Jacqueson Elie are among those investors who lost their investments and savings as a result of Delgado's fraudulent scheme and JPMorgan's and Bank of America's knowing participation in that scheme. Goliath is now in receivership and will be unlikely to be able to make full restitution to victims. But on behalf of themselves and other investors like them, Plaintiffs seek to hold JPMorgan and Bank of America liable for aiding and abetting Delgado's fraud and to require the banks to make amends to the scheme's victims.

**PARTIES**

6. Plaintiff David Josef Roshwald is an individual who resides in Ocala, Florida.

7. Plaintiff JP Politano is an individual who resides in Deltona, Florida.

8. Plaintiff Jacqueson Elie is an individual who resides in Orlando, Florida.

9. Defendant JPMorgan Chase, N.A., is a Delaware corporation with its principal place of business in Columbus, Ohio.

10. Defendant Bank of America, N.A., is a Delaware corporation with its principal place of business in Charlotte, North Carolina.

**JURISDICTION AND VENUE**

11.     The Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332(d)(2) because this is a class action in which the amount in controversy exceeds $5,000,000, exclusive of interest and costs; in the aggregate, there are more than 100 members in the proposed class; and at least one class member is a citizen of a state different from Defendants.

12.     The Court has specific personal jurisdiction over Defendants because Plaintiffs' claims arise out of and relates to Defendants' unlawful conduct in Florida.

13.     Pursuant to 28 U.S.C. § 1391(b), venue is proper in the Southern District of Florida because a substantial part of the events and omissions giving rise to the claims occurred in this District, including the solicitation of investors who reside in this District, the dissemination of marketing materials to investors who reside in this District, and the transfer of capital to Goliath's bank accounts from investors who reside in this District.

**FACTUAL ALLEGATIONS**

**I.      Delgado operated Goliath Ventures as a fraudulent scheme.**

14.     Christopher Alexander Delgado established Goliath Ventures in 2019. He initially called it Gen-Z Venture Firm, but changed its name to Goliath in 2021. Delgado served as the president and chief executive officer of the company.

15.     Goliath marketed itself as a private fund that invested in blockchain and cryptocurrency projects. The company employed associates to solicit investors through presentations and marketing materials. Delgado and his associates told potential investors that their money would be placed in liquidity pools, where it would earn passive income. A liquidity pool is a collection of cryptocurrency held in a smart contract, or a digital agreement stored on a blockchain network. The purpose of a liquidity pool is to facilitate trades of cryptocurrency on a

decentralized exchange. Those who deposit into a liquidity pool typically receive a portion of transaction fees or other incentives generated by trading activity within the pool.

16.     Delgado and Goliath made specific representations to investors about how the company would use their funds. They told investors that their money would move from a traditional bank account in Goliath's name (such as ones at JPMorgan and Bank of America) to Coinbase, then to an encrypted ledger, and then to liquidity pools that would generate returns for them. The liquidity pools would run on one or more exchanges, such as Uniswap. Goliath included the below illustration of this investment cycle in its marketing materials:



17.     Individuals could become investors by entering into "Joint Venture Agreements" with Goliath. The agreements detailed how Goliath would place investor money into liquidity pools and then distribute returns from those liquidity pools. The agreements guaranteed monthly returns ranging from 3-8% and/or guaranteed the return of an investor's principal. Goliath gave

investors the option to withdraw their monthly returns or "roll over" the monthly returns, which would increase their account balances.

18.     Goliath's marketing materials described its investment strategy as one that entailed active monitoring and risk management. They mentioned risk management tools such as stop-loss mechanisms, slippage monitoring, and centralized exchange hedging.

19.     Goliath and Delgado's pitch was successful. Between January 2023 and January 2026, Goliath raised at least $328 million from investors. Investors resided across the country, including in Florida, California, New York, and Nevada, and internationally, including in Canada. Goliath had investors wire their capital contributions to Goliath's bank accounts at JPMorgan and/or Bank of America.

20.     Investors entrusted Goliath and Delgado with their money. Goliath and Delgado, for their part, took control over investors' funds and promised to invest it safely in liquidity pools. Through the joint venture agreement, investors also gave Goliath sole discretion to make investment decisions on their behalf, including the discretion to change the investment methods. Goliath's discretion could be based on market conditions, or on its own opinion that a different investment approach is more suitable for investors' money.

21.     Goliath provided investors with monthly statements and, beginning in around August 2025, with access to an online account portal that supposedly displayed real-time account activity, including an investor's principal and amount of returns. The statements and portal showed the promised monthly gains for each investor.

22.     Delgado and Goliath became well-known in their community. Delgado was named as one of the "20 Entrepreneurs Who Are Building Empires in 2023" by USA Today. Goliath served as the title sponsor of The Vault in 2025, a widely known annual conference for company

founders and business leaders. Goliath also advertised its purported donations of over $500,000 to local charities in 2023 and another $1 million in 2024 and 2025.

23.     The problem for investors is that the representations Goliath made in its marketing materials, joint venture agreements, account statements, and online portal were false. Although some investor money from the JPMorgan and Bank of America accounts were transferred to Coinbase (where Goliath let it sit instead of placing it in liquidity pools), a substantial sum of investor funds stayed in the traditional bank accounts. Instead of placing investor funds in liquidity pools, Delgado was using nearly all of those funds to pay for his lavish lifestyle and—in classic Ponzi-like fashion—using new investor funds to pay previous investors. Of the over $300 million Delgado and Goliath obtained from investors from January 2023 through January 2026, only $1.5 million was actually deposited into a liquidity pool.

24.     The reporting that Goliath provided to investors in its online portal and through its monthly statements was fraudulent. While the amount of stated principal investments on the portal and statements was accurate, the reported returns (displayed as "Monthly Distribution Rates" and "Monthly Distribution Balances") were not generated from a liquidity pool or any investment activity. Goliath falsified the rate of return displayed for each investor to match the rate of return that it promised to him.

25.     The Goliath fraud started unfolding in late 2025, when the company began delaying payments to investors. Goliath and Delgado provided varying excuses for the delays, such as audits and compliance issues, while assuring investors that payments would resume in short order. Around the same time, Goliath denied several investors' requests for a return of their principal.

26.     On February 24, 2026, Delgado was arrested and charged with money laundering and wire fraud in connection with the operation of Goliath. Since then, all payments to investors

have been suspended, investors have been unable to access Goliath's mobile application and online platform, and questions about where their investments stand have gone unanswered.

**II.     JPMorgan and Bank of America aided and abetted Delgado's Ponzi scheme.**

27.     The Goliath fraud only succeeded because JPMorgan and Bank of America provided accounts that Delgado could use to receive investor funds and then transfer those funds to himself as well as to previous investors. These banks were among the select few who had a full view of how Goliath was using investor money.

28.     Federal law requires JPMorgan and Bank of America to know their customers and understand their customers' banking behavior. *See* 31 C.F.R. §§ 1020.220(a)(1), (2). Financial institutions are required to collect information about the holder of each account. When an entity opens an account, banks obtain information concerning the individuals who control the account. 31 C.F.R. § 1020.220(a)(2)(ii)(C).

29.     Federal regulations, including 12 C.F.R. § 21.21, require banks to develop, administer and maintain a program to ensure compliance with federal Anti-Money-Laundering (AML) laws. Each program is approved by a bank's board of directors and: (1) provides a system of internal controls to ensure compliance at all times, (2) provides for independent testing of the bank's ongoing compliance, (3) designates an individual to coordinate and monitor compliance, and (4) provides training for appropriate personnel.

30.     To further combat money laundering, the federal government established the Federal Financial Institutions Examination Council (FFIEC) in 1979. Banks like JPMorgan and Bank of America receive guidance from the FFIEC, which is tasked with ensuring consistency in AML compliance efforts across the banking sector.

31. Consistent with FFIEC guidelines, financial institutions maintain a customer due diligence program to assist in predicting the types of transactions, dollar volume, and transaction volume each customer is likely to conduct, thereby providing the bank with a means of identifying unusual or suspicious transactions for each customer. A customer due diligence program allows a bank to maintain awareness of the financial activity of its customers and to predict the type and frequency of transactions in which its customers are likely to engage.

32. FFIEC publications also describe certain "red flags" that indicate possible money laundering schemes and other financial misconduct mandating further inquiry, including:

a. "Many funds transfers are sent in large, round dollar, hundred dollar, or thousand dollar amounts."

b. "Funds transfer activity is unexplained, repetitive, or shows unusual patterns."

c. "Unusual use of trust funds in business transactions or other financial activity."

d. "A large volume of . . . funds transfers is deposited into . . . an account when the nature of the accountholder's business would not appear to justify such activity."

e. "Goods or services purchased by the business do not match the customer's stated line of business."

f. "Goods or services, if identified, do not match profile of company provided by respondent bank or character of the financial activity . . . ."

g. "Customer makes high value transactions not commensurate with the customer's known incomes."

h. "Payments or receipts with no apparent links to legitimate contracts, goods, or services are received."

  i. "Payments to or from the company have no stated purpose, do not reference goods or services, or identify only a contract or invoice number."

  j. "Funds transfers contain limited content and lack related party information."

  k. "Funds transfers are sent or received from the same person to or from different accounts."

  l. "Unusual transfers of funds occur among related accounts or among accounts that involve the same or related principals."

  m. "Multiple high-value payments or transfers between shell companies with no apparent legitimate business purpose."

  n. "Purpose of shell company is unknown or unclear."

  o. "Customer has established multiple accounts in various corporate or individual names that lack sufficient business purpose for the account complexities or appear to be an effort to hide the beneficial ownership from the bank."

  p. "A large number of incoming or outgoing funds transfers take place through a business account, and there appears to be no logical business or other economic purpose for the transfers, particularly when this activity involves higher-risk locations."

33. As detailed below, the activity within Goliath's bank accounts at JPMorgan and Bank of America reflected many common signs of money laundering and fraud. In the course of performing its customer due diligence obligations and AML compliance, the banks learned that Delgado was running a fraudulent scheme, using deposits from new investors to pay existing investors, and using investor deposits to pay for corporate and personal expenses that had no business purpose.

A.      **JPMorgan**

34.      Goliath held a business bank account at JPMorgan (ending in 0305). Delgado was the sole signatory on the account and had full control over it. He determined how investor funds within the account would be allocated, and he was the one who directed transfers from the account.

35.      Between January 2023 and June 2025, approximately $253 million in investor funds was deposited into Goliath's JPMorgan account.

36.      During this same period, JPMorgan saw Delgado use investor funds from this account for several of his high-dollar value personal purchases. This included a wire transfer of over $350,000 to purchase property in Sanford, Florida titled in his name and purchases of luxury vehicles and designer jewelry and watches. Goliath also used investor funds deposited into this account to pay for Goliath's corporate spending, luxury travel accommodations, and extravagant events. And Delgado sent approximately $50 million in purported returns to investors directly from this same account.

37.      Consistent with federal regulations, JPMorgan was obligated to know its customer—Goliath—and the holder of the account—Delgado. These "know your customer" obligations are ongoing and required JPMorgan to familiarize itself with Delgado, the nature of Goliath's operations, the source and legitimacy of its funds, and the purpose of its bank account and ongoing financial transactions.

38.      As a result of its customer due diligence, JPMorgan learned that Delgado was operating a fraudulent scheme by using deposits from new investors to pay existing investors and using investor deposits to pay Delgado's personal expenses, as well as Goliath's corporate expenses.

39.     JPMorgan was also obligated to monitor Goliath's account for "red flags" indicative of potential money laundering and fraud and to report suspicious activity to governmental authorities. JPMorgan's knowledge of Delgado's fraud was an inevitable consequence of several red flags that made the scheme obvious to someone in JPMorgan's position, including:

a.  JPMorgan saw Goliath's misappropriation of funds in Goliath's account at the bank: new investor money was deposited into Account 0305, and then some of that money was used to distribute purported returns to investors.

b.  Goliath was among JPMorgan's largest clients in the region, making its banking activity highly visible and important to JPMorgan.

c.  Delgado had sole control over Goliath's account—an unusual arrangement for an investment company of this size, which would normally employ a management structure and multiple signatories.

d.  Goliath's account showed many funds transfers sent in large, round dollar amounts.

e.  Goliath's transfer activity was unexplained, repetitive, and showed unusual patterns.

f.  Goliath's transfers were sent or received from the same person to or from different accounts.

g.  A large volume of funds transfers was deposited into Goliath's account when the nature of Goliath's business would not appear to justify such activity.

h.  Goliath's account showed that it required new investor money each month to meet its monthly obligations.

i.  Goliath's payments or receipts had no apparent links to legitimate contracts, goods, or services.

j.   Payments to or from Goliath's account had no stated purpose, did not reference goods or services, or identified only a contract or invoice number.

k.   Goods or services purchased by Goliath did not match Goliath's stated line of business.

l.   Goods or services, if identified, did not match profile of Goliath's stated financial activity.

m.  Investor funds were commingled with other investor funds, as well as with Goliath's corporate money and money Delgado was using for personal expenses.

40.   JPMorgan provided the banking assistance that Delgado needed to successfully operate his fraudulent scheme. Although JPMorgan knew Delgado was defrauding investors and using their contributions to pay previous investors and for Delgado's personal expenses, it chose to profit from—rather than expose—the illicit business.

**B.   Bank of America**

41.   Goliath also held a business bank account at Bank of America (ending in 9136). Delgado was a co-signer on that account and had control over how investor funds within it were allocated, even though other individuals at Goliath may have also had access to the same account.

42.   Between May 2025 and September 2025, approximately $75 million in investor funds was deposited into Goliath's Bank of America account.

43.   During this same period, Bank of America saw Delgado use investor funds from this account for personal purchases, including a wire transfer of $500,000 to purchase property in Windermere, Florida titled in his name. Goliath also used investor funds deposited into this account to pay for Goliath's corporate spending, luxury travel accommodations, and extravagant events.

And Delgado sent approximately $11 million in purported returns to investors directly from Goliath's Bank of America account.

44.     Bank of America was obligated to know its customer—Goliath—and the holder of the account—Delgado. These "know your customer" obligations are ongoing and required Bank of America to familiarize itself with Delgado, the nature of Goliath's operations, the source and legitimacy of its funds, and the purpose of its bank account and ongoing financial transactions.

45.     In the course of performing its customer due diligence obligations, Bank of America learned that Delgado was operating a fraudulent scheme, using deposits from new investors to pay existing investors, and using investor deposits to pay Delgado's personal expenses.

46.     Bank of America was also obligated to monitor Goliath's account for "red flags" indicative of potential money laundering and fraud and to report suspicious activity to governmental authorities. Bank of America's knowledge of Delgado's Ponzi scheme was an inevitable consequence of several red flags that made the scheme obvious to someone in the bank's position:

   a.   Bank of America saw Goliath's misappropriation of funds in Goliath's account at the bank: new investor money was deposited into Account 9136, and then some of that money was used to distribute purported returns to investors.

   b.   Goliath was among Bank of America's largest clients in the region, making its banking activity highly visible and important to Bank of America.

   c.   Delgado kept close control over Goliath's account—an unusual arrangement for an investment company of this size, which would normally employ a management structure and multiple signatories

   d.   Goliath's account showed many funds transfers sent in large, round dollar amounts.

e.  Goliath's transfer activity was unexplained, repetitive, and showed unusual patterns.

f.  Goliath's transfers were sent or received from the same person to or from different accounts.

g.  A large volume of funds transfers was deposited into Goliath's account when the nature of Goliath's business would not appear to justify such activity.

h.  Goliath's account showed that it required new investor money each month to meet its monthly obligations.

i.  Goliath's payments or receipts had no apparent links to legitimate contracts, goods, or services.

j.  Payments to or from Goliath had no stated purpose, did not reference goods or services, or identified only a contract or invoice number.

k.  Goods or services purchased by Goliath did not match Goliath's stated line of business.

l.  Goods or services, if identified, did not match profile of Goliath's stated financial activity.

m.  Investor funds were commingled with other investor funds, as well as with Goliath's corporate money and money Delgado was using for personal expenses.

47.    Along with JPMorgan, Bank of America provided the banking assistance that Delgado needed to operate his fraudulent scheme. Although Bank of America knew Delgado was defrauding investors and using their contributions to pay previous investors and for Delgado's personal expenses, it chose to profit from—rather than expose—his illegal conduct.

**III.    Plaintiffs' experience.**

**A.      David Josef Roshwald**

48.      In November 2025, Plaintiff David Josef Roshwald invested $100,000 with Goliath Ventures.

49.      Roshwald learned of the opportunity to invest in the venture from a friend who knew Delgado and who had also invested with Goliath. Goliath, through one of its employees Stephen Davis, told Roshwald via e-mail in Fall 2025 that his investment funds would be placed in a liquidity pool that ran on a decentralized cryptocurrency exchange, and that he would receive monthly interest payments generated by that liquidity pool. Roshwald relied on those representations in deciding to invest.

50.      On or about November 26, 2025, Roshwald executed a joint venture agreement with Goliath. On or about November 26, 2025, Delgado executed the joint venture agreement on behalf of Goliath. The agreement stated that Roshwald would contribute funds for placement into liquidity pools and that he would be entitled to 3% monthly interest from his contribution. Goliath also guaranteed that if Roshwald elected to withdraw some or all of his investment, Goliath would process the withdrawal request within 30 days.

51.      On or about November 28, 2025, per Goliath's instructions, Roshwald wired $100,000 to Goliath's Bank of America bank account. Roshwald indicated that the money was for a "Joint Venture" in the "Purpose" section of the wire when he sent it to Bank of America.

| Intermediary Bank | | Beneficiary Bank | |
|---|---|---|---|
| Name | | Name | BK AMER NYC |
| Address | | Address | BANK OF AMERICA, N.A., NY |
| | | | NEW YORK  NY |
| Country | | Country | US |
| ABA / Routing | | ABA / Routing | 026009593 |

**Beneficiary**

Name    GOLIATH VENTURES INC

Address    189 S. ORANGE AVE SUITE 1800

ORLANDO, FL 32801

Account    █████9136

Country    UNITED STATES

Originator Reference

Originator to Beneficiary Info [Purpose]    DAVID ROSHWALD, JOINT VENTURE

52.    Roshwald received monthly communications from Goliath about his new account balance, which reflected the monthly interest his investment was accruing. Roshwald "rolled over" his monthly returns.

53.    During the period he was making investments, Roshwald was never informed of the true nature of how Goliath and Delgado were using his money. Had he known the truth, Roshwald never would have invested in Goliath.

54.    To date, Roshwald has received no payments as purported returns on his investment. The losses Roshwald has incurred have caused hardship to Roshwald and his family.

**B.    JP Politano**

55.    Between December 2024 and April 2025, Plaintiff JP Politano invested approximately $80,000 with Goliath Ventures.

56.    Politano learned of the opportunity to invest in the venture from a friend who had invested with Goliath. Goliath, through one of its employees Alex Bukalo, told Politano in person and via e-mails and text messages in late 2024 that his investment funds would be placed in a liquidity pool that ran on a decentralized cryptocurrency exchange, and that he would receive

monthly interest payments generated by that liquidity pool. Politano relied on those representations in deciding to invest.

57.     On or about December 26, 2024, Politano executed a joint venture agreement with Goliath. On or about December 26, 2024, Delgado executed the joint venture agreement on behalf of Goliath. The agreement stated that Politano would contribute funds for placement into liquidity pools and that he would be entitled to 4% monthly interest from his contribution. Through the agreement, Goliath guaranteed the return of Politano's principal contribution. Goliath also guaranteed that if Politano elected to withdraw some or all of his investment, Goliath would process the withdrawal request within a 24-to-72-hour period.

58.     On or about December 27, 2024, per Goliath's instructions, Politano wired $50,000 to Goliath's JPMorgan account. Subsequently, Politano funded a total of approximately $30,000 more in additional investments to Goliath's JPMorgan account, also purportedly for placement into liquidity pools.

59.     Politano received monthly communications from Goliath about his new account balance, which reflected the monthly interest his investment was accruing. Politano primarily "rolled over" his monthly returns.

60.     During the period he was making investments, Politano was never informed of the true nature of how Goliath and Delgado were using his money. Had he known the truth, Politano never would have invested in Goliath.

61.     On or about February 23, 2026, Politano requested to withdraw his investment from Goliath, which had accumulated to approximately $117,000. Goliath confirmed that it had received Politano's request and that it would distribute the funds to him within seven to ten business days. Goliath never returned Politano's investment pursuant to his request.

62.     To date, Politano received payments of $7,200 in purported returns on his investments. The losses Politano has incurred have caused hardship to Politano and his family.

**C.     Jacqueson Elie**

63.     Between December 2024 and April 2025, Plaintiff Jacqueson Elie invested approximately $90,000 with Goliath Ventures.

64.     Elie learned of the opportunity to invest in the venture from a friend who knew Delgado and who had also invested with Goliath. Goliath, through one of its employees Stephen Davis, told Elie in person in 2023 and 2024 that his investment funds would be placed in a liquidity pool that ran on a decentralized cryptocurrency exchange, and that he would receive monthly interest payments generated by that liquidity pool. Elie relied on those representations in deciding to invest.

65.     In or around August 2024, Elie executed a joint venture agreement with Goliath, and Delgado executed the joint venture agreement on behalf of Goliath. The agreement stated that Elie would contribute funds for placement into liquidity pools and that he would be entitled to 4% monthly interest from his contribution.

66.     In or around August 2024, per Goliath's instructions, Elie wired $50,000 to Goliath's JPMorgan account. Subsequently, Elie funded a total of approximately $40,000 more in additional investments to Goliath's JPMorgan account, also purportedly for placement into liquidity pools.

67.     Elie received monthly communications from Goliath about his new account balance, which reflected the monthly interest his investment was accruing. Elie "rolled over" his monthly returns.

68.     During the period he was making investments, Elie was never informed of the true nature of how Goliath and Delgado were using his money. Had he known the truth, Elie never would have invested in Goliath.

69.     In November 2025, Elie requested a distribution of the interest that accumulated on his investment. Goliath, through its employee Stephen Davis, told Elie that there was a temporary pause on distributions. Approximately one month later, in December 2025, Elie requested to exit the investment entirely and requested a return of his investment. Goliath, again through Davis, told Elie that his request could not be processed. Goliath never returned Politano's investment pursuant to his requests.

70.     To date, Elie has received no payments as purported returns on his investment. The losses Elie has incurred have caused hardship to Elie and his family.

### TOLLING OR NON-ACCRUAL OF STATUTES OF LIMITATIONS

71.     Plaintiffs and the Class did not and could not have discovered the facts constituting Defendants' unlawful conduct until February 24, 2026, when Delgado was arrested and charged with money laundering and wire fraud.

72.     Because Plaintiffs and Class members could not have reasonably discovered the facts constituting Defendants' unlawful conduct until February 24, 2026, their claims accrued on that date and any applicable statutes of limitations were tolled until that date.

### CLASS ACTION ALLEGATIONS

73.     Pursuant to Federal Rule of Civil Procedure 23, Plaintiffs bring this action on behalf of themselves and the following Class:

*All natural and legal persons who invested money with Goliath Ventures Inc.*

74. Excluded from the Class are Defendants, Goliath, and Delgado; their parents, affiliates, subsidiaries, legal representatives, predecessors, successors, assigns, and employees; and any judge to whom this case is assigned, his or her spouse, and all persons within the third degree of relationship to either of them, as well as the spouses of such persons.

75. Class membership will be determined based on objective criteria including whether any person transmitted money to Goliath for investment in liquidity pools. Documents identifying the investors in the Class are in the possession, custody, and control of Defendants, Goliath, and Delgado.

76. Numerosity. The members of the Class are so numerous that joinder of all members is impractical. The size of the Class, which is estimated to consist of hundreds if not thousands of individuals and business entities, can be ascertained only through discovery.

77. Typicality. Plaintiffs' claims against Defendants are typical of the claims of the members of the Class. Plaintiffs and Class members were all victims of the fraudulent scheme, each has claims against Defendants relating to the scheme, and each claim will depend on common proof of Defendants' wrongful conduct.

78. Adequacy. Plaintiffs will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class action and financial fraud litigation.

79. Commonality and Predominance. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. The questions of law and fact common to the Class include:

   a. Whether Goliath and Delgado engaged in a fraudulent investment scheme;

b.  Whether Delgado used the Goliath JPMorgan account and the Goliath Bank of America account to perpetrate the alleged fraud;

c.  Whether JPMorgan and Bank of America had actual knowledge of the fraudulent conduct at issue;

d.  Whether JPMorgan and Bank of America substantially assisted the fraud; and

e.  Whether Plaintiffs and Class members were damaged as a result of Defendants' conduct.

80.   Superiority. A class action is superior to other available means for the fair and efficient adjudication of this dispute. The injury suffered by each Class member, while meaningful on an individual basis, is not of such magnitude as to make the prosecution of individual actions economically feasible. Even if Class members themselves could afford such individualized litigation, the court system could not. In addition to the burden and expense of managing many actions arising from the same fraudulent scheme, individualized litigation presents a potential for inconsistent or contradictory judgments. Individualized litigation increases the delay and expense to all parties and the court system presented by the legal and factual issues of the case. By contrast, a class action presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

81.   In the alternative, the Class may be certified because: (a) the prosecution of separate actions by the individual members of the proposed Class would create a risk of inconsistent adjudications; (b) the prosecution of individual actions could result in adjudications, which as a practical matter, would be dispositive of interests of non-party class members or which would substantially impair their ability to protect their interest; and (c) Defendants have acted or refused

to act on grounds generally applicable to the Class, thereby making appropriate final and injunctive relief with respect to the members of the Class as a whole.

## FIRST CAUSE OF ACTION
### Aiding and Abetting Fraud

82.     Plaintiffs allege this cause of action on behalf of themselves and the Class against Defendants JPMorgan and Bank of America, and in doing so, incorporates all preceding allegations.

83.     As set forth above, Delgado and Goliath defrauded Plaintiffs and Class members by promising them that their investment funds would be placed in liquidity pools that generated consistent returns, when in reality their money was instead used to pay existing investors and to fund Delgado's and Goliath's personal and corporate expenses.

84.     Delgado and Goliath intentionally misrepresented and omitted material facts in connection with the purported investment opportunity into liquidity pools. Plaintiffs reasonably relied to their detriment on such representations and omissions by choosing to invest and depositing their money into Goliath's JPMorgan and Bank of America accounts.

85.     Defendants JPMorgan and Bank of America aided and abetted Delgado's fraud and is accordingly liable for the damage caused to Plaintiffs and Class members. Both banks knew of Delgado's fraudulent scheme as a result of performing their customer-due-diligence and anti-money laundering obligations and gave substantial assistance to the scheme.

86.     As a result of JPMorgan's and Bank of America's aiding and abetting Delgado's and Goliath's fraud, Plaintiffs and Class members have been damaged in an amount to be determined at trial.

## SECOND CAUSE OF ACTION
### Aiding and Abetting Breach of Fiduciary Duty

87.     Plaintiffs allege this cause of action on behalf of themselves and the Class against Defendants JPMorgan and Bank of America, and in doing so, incorporates all preceding allegations.

88.     Delgado and Goliath owed Plaintiffs and other Class members a fiduciary duty based on the high degree of control and discretion they had over investors' money. Delgado and Goliath breached that duty by misappropriating investors' funds; instead of investing it in liquidity pools as promised, Delgado and Goliath used their money to pay existing investors and to enrich themselves.

89.     JPMorgan and Bank of America knew that Delgado solicited and accepted investments and that Goliath and Delgado owed investors a fiduciary duty to act in the best interests of those investors.

90.     JPMorgan and Bank of America also knew that Goliath and Delgado were breaching their fiduciary duties. As previously alleged, JPMorgan and Bank of America learned of Delgado's and Goliath's fraudulent scheme in the course of performing their customer-due-diligence and anti-money laundering obligations. Yet instead of exposing the scheme, JPMorgan and Bank of America substantially assisted Delgado and Goliath in operating the scheme and in breaching their fiduciary duties to Plaintiffs and Class members.

91.     As a result of JPMorgan's and Bank of America's aiding and abetting Delgado's and Goliath's breach of their fiduciary duties, Plaintiffs and Class members have been damaged in an amount to be determined at trial.

## PRAYER FOR RELIEF

Wherefore, Plaintiffs, on behalf on themselves and all others similarly situated, request that the Court enter a judgment awarding the following relief:

a.  An order certifying the proposed Class and appointing the undersigned counsel as class counsel;

b.  An award of damages in an amount to be determined at trial;

c.  Pre-judgment and post-judgment interest, as provided by law;

d.  An award of Plaintiffs' reasonable attorneys' fees and litigation costs; and

e.   Such other and further relief as this Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiffs demand a trial by jury as to all issues so triable.

Respectfully submitted:  March 17, 2026

/s/ Ryan A. Schwamm

**SILVER LAW GROUP**
Scott L. Silver
Florida Bar No.: 095631
Ryan A. Schwamm
Florida Bar No.: 1019116
Peter M. Spett
Florida Bar No. 0088840
1780 W. Sample Road
Coral Springs, FL 33065
T: (954) 755-4799
F: (954) 755-4684
E-Mail: ssilver@silverlaw.com
rschwamm@silverlaw.com
pspett@silverlaw.com

/s/ Linda P. Lam

**GIBBS MURA LLP**
David Stein (*pro hac vice* to be submitted)
Linda P. Lam (*pro hac vice* to be submitted)
1111 Broadway, Suite 2100
Oakland, CA 94607
T: (510) 350-9700
F: (510) 350-9701
E-Mail: ds@classlawgroup.com
lpl@classlawgroup.com

Emily Beale (*pro hac vice* to be submitted)
136 Madison Avenue, Suite 541
New York, NY 10016
T: (510) 350-9700
F: (510) 350-9701
E-Mail: eb@classlawgroup.com